**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| MARCELLA HAWKINS, : | |
| : | |
| Plaintiff, : | Civ. Action No.  03-4729 (JAG) |
| : | |
| v. : | **OPINION** |
| : | |
| JO ANNE B. BARNHART, : | |
| COMMISSIONER OF SOCIAL SECURITY, : | |
| : | |
| : | |
| Defendant. : | |

**GREENAWAY, JR., U.S.D.J**

**INTRODUCTION**

Plaintiff Marcella Hawkins ("Plaintiff") seeks review of the Commissioner of Social Security's (the "Commissioner") decision terminating her period of disability as of January 18, 2001, pursuant to 42 U.S.C. § 405(g)(2004).[1]  The Commissioner's decision also denied Plaintiff's applications for Disability Insurance Benefits, Supplemental Security Income Benefits, and Disabled Widow's Insurance Benefits.  Plaintiff asserts that substantial evidence exists in the record to support a finding of disability status after January 18, 2001, and therefore this Court should reverse the decision of the Commissioner or, in the alternative, remand this claim to the Commissioner for reconsideration.  (Pl.'s Br. at 1.)  Based on this Court's review, there is

---

[1] This section of the Social Security Act [hereinafter the "Act"] provides that any individual who was a party to a hearing before the Secretary may commence a civil action within 60 days after the Secretary's final determination.  The appropriate forum for this action is the district court of the United States judicial district in which the plaintiff resides. 42 U.S.C. § 405(g).

1

substantial evidence to support the Commissioner's decision.  The Commissioner's decision shall be affirmed.

## PRIOR PROCEEDINGS

On July 24, 2000, Plaintiff filed applications for Disability Insurance Benefits and for Supplemental Security Income, alleging disability effective December 13, 1999, due to breast cancer and residual side effects of associated treatments.  (Tr. 69-71.)[2]  Plaintiff's applications were denied initially and denied upon reconsideration.  (Tr. 59-61.)  On July 9, 2001, Plaintiff filed a request for a hearing (Tr. 62),[3] and a hearing was held on January 31, 2002 before Administrative Law Judge Richard L. De Steno  ("ALJ De Steno").  (Tr. 64-67.)

Plaintiff also filed an application for Disabled Widow's Benefits on October 5, 2001. (Tr. 69-71.)  ALJ De Steno escalated the widow's claim to the hearing level and consolidated it for review with the other applications, pursuant to 20 C.F.R. § 404.952.  (Tr. 14.)

ALJ De Steno issued his partially favorable decision on February 25, 2002, granting Plaintiff's application for the closed period of December 13, 1999 through January 17, 2001, but found that her disability ceased on January 18, 2001.  (Tr. 10-21.)  The following is a summary of the ALJ's findings:

1.      The claimant meets the insured status requirements of Title II of the Act at all times pertinent herein.  She also meets the non-disability criteria for entitlement to surviving divorced spouse's benefits, insofar as she was married to the insured

_____

[2] The Social Security Act requires the Secretary to file a certified copy of the transcript of the record ("Tr.") including any evidence used to formulate her conclusion or decision.  42 U.S.C. § 405(g)(2000).

[3] Upon receipt of an adverse reconsideration determination, the claimant is entitled to an evidentiary hearing and de novo review by an administrative law judge.  Heckler v. Day, 467 U.S. 104, 106 (1984).

number holder for at least 10 years, is currently unmarried, and is between the ages of 50 and 60.

2.    The claimant did not perform any substantial gainful activity from December 13, 1999 through May 6, 2001.  She did engage in substantial gainful activity from May 7, 2001 until mid-January 2002.

3.    From December 13, 1999 through January 17, 2001, the claimant had "severe" impairments consisting of breast cancer and the side effects of chemotherapy and radiation treatments.  Since January 18, 2001, her "severe" impairments are status post right breast carcinoma and the residual effects of chemotherapy and radiation treatment.

4.    The claimant's impairments have not been clinically manifested at a degree that meets or equals the criteria of any disorder contained within the Listing of Impairments.

5.    The claimant's subjective complaints of disabling pain and other symptoms and limitation are not fully credible or consistent with the objective medical evidence for the period on and after January 18, 2001.

6.    From December 13, 1999 through January 17, 2001, the claimant lacked the residual functional capacity to perform a full, wide or significant range of even sedentary work.

7.    Since January 18, 2001, the claimant has retained the residual functional capacity to perform a full range of light work.

8.    From December 13, 1999 through January 17, 2001, the claimant was incapable of performing any of her past relevant work.

9.    From December 13, 1999 through January 17, 2001, the claimant was unable to make a successful covational adjustment to other jobs existing in significant numbers in the national economy.  On and after January 18, 2001, the claimant experienced medical improvement related to the ability to work.

10.   On and after January 18, 2001, the claimant's residual functional capacity accorded her the ability to perform her past relevant work as an in-house decorating consultant for a retail store.

11.   The claimant was under a disability within the definition of the Act and regulations for a closed period from December 13, 1999 through January 18, 2001, but not thereafter.

(Tr. 19-20.)  ALJ DeSteno concluded that Plaintiff is entitled to a closed period of disability,

December 13, 1999 through January 17, 2001, but not thereafter, and to appropriate disability

insurance benefits under sections 216(I) and 223 of the Act.  (Tr. 20.)  Plaintiff subsequently

sought review by the Social Security Administration Appeals Council.  (Tr. 3-5.)  On August 8,

2003, the Appeals Council found no grounds for review of ALJ DeSteno's decision under the

Social Security Administration regulations.[4]  (Tr. 3-5).  Plaintiff subsequently filed the instant

action, seeking review of the Commissioner's final decision, pursuant to 42 U.S.C. § 405(g).

## STATEMENT OF THE FACTS

### A.  Background

Plaintiff Marcella Hawkins is 51 years old.  (Tr. 29.)  She is a high-school graduate with

one year of secretarial school training.  (Tr. 29.)  From July 1988 until her cancer was discovered

in December 1999, Plaintiff worked as a decorating consultant in retail stores.  (Tr. 30.)  Plaintiff

testified that this work required that she stand most of the day and regularly lift ten to twenty

pound objects.  (Tr. 30-31.)  She was also required to restock shelves, including heavy items such

as cans of paint.  (Tr. 31.)

In December 1999, Plaintiff had a routine mammogram and a clinically suspicious, right-

breast mass was discovered.  (Tr. 138-40.)  The biopsy, on December 15, 1999, revealed that the

---

[4] Social Security Administration regulations provide that the Appeals Council will grant a request for review where: (1) there appears to be an abuse of discretion by the ALJ; (2) there is an error of law; (3) the ALJ's action, findings, or conclusions are not supported by substantial evidence; or (4) there is a broad policy or procedural issue which may affect the general public interest.  20 C.F.R. § 416.1470 (2003).

Additionally, the Appeals Council will grant review where new and material evidence is submitted with the request for review and, upon an evaluation of the entire record, if the Appeals Council finds that the ALJ's actions, findings, or conclusion is contrary to the weight of the evidence currently on the record.  Id.

mass was moderately differentiated infiltrating duct carcinoma.[5]  (Tr. 147-48).  On January 21,
2000, Dr. Thomas Kearney performed a right partial mastectomy with full axillary lymph node
dissection.[6]  (Tr. 161.)  On February 7, 2000, Dr. Kearney did a re-excision of the mastectomy
site, with aspiration of post-operative seroma.  (Tr. 158.)  Plaintiff was admitted to the hospital
on February 15, 2000 to treat a recurrent axillary cellulitis[7] with an intravenous antibiotic.  (Tr.
170.)  This infection was resolved and only required an overnight stay.  (Tr. 170.)

        Plaintiff's chemotherapy treatments began in March, 2000, and ended September 21,
2000.  (Tr. 173, 185.)  Her treating oncologist, Dr. William Hait, administered adriamycin,
cytoxan, and taxol.  (Tr. 173.)  Plaintiff's radiation therapy began in October 2000, under the
supervision of Dr. Eric Karp, and was completed, six weeks later, in late December, 2000.  (Tr.
34, 190.)  During radiation Plaintiff also began taking tamoxifen.  (Tr. 187, 195.)

        On April 19, 2001, Plaintiff had a  routine follow-up visit with Dr. Hait, which revealed
no breast masses or bilateral axillary adenopathy[8] during the physical examination. (Tr. 188.)
Plaintiff told Dr. Hait that she had been feeling well except for some fatigue, although the fatigue
had been improving.  (Tr. 188.)

---

        [5] A duct is a narrow tubular structure, generally a structure through which material is
secreted or excreted.  Mosby's Medical, Nursing, & Allied Health Dictionary 1026 (26th ed.
2000) [hereinafter "Mosby's"].  A duct carcinoma is a neoplasm of the epithelium covering of
ducts, especially in the breast or pancreas.  Id.

        [6]Axillary dissection is the "surgical removal of axillary nodes, done as part of radical
mastectomy."  Mosby's at 168.

        [7] The definition of Cellulitis "a diffuse, acute infection of the skin and subcutaneous
tissue . . . [a]bscess and tissue destruction usually follow if antibiotics are not taken."  Mosby's at
314-15.  Axillary is "pertaining to the armpit."  Mosby's at 168.

        [8] Axillary adenopathy is an enlargement of the axillary gland.  Mosby's at 41.

**B.  Medical Evidence**

The record indicates that Plaintiff received medical attention on several occasions.

**1.  Examinations by Dr. Thomas Kearney**

On January 21, 2000, Dr. Kearney performed a partial mastectomy with full axillary lymph node dissection, which he reported went well and Plaintiff was in good condition.  (Tr. 160-62.)  Dr. Kearney's report on Plaintiff's January 25, 2000, postoperative visit noted that Plaintiff was healing well and the postoperative headache, which had kept her in the hospital overnight, had resolved.  (Tr. 160.)  Pathology revealed, however, that Plaintiff needed a re-excision to remove the superior margin of the lumpectomy site.  (Tr. 160.)  On February 7, 2000, Dr. Kearney performed a re-excision on the right breast carcinoma in order to remove more of the margins, which had tested positive for cancer.  (Tr. 157-58.)  Dr. Kearney also drained a seroma in the axilla.  (Tr. 158.)  Dr. Kearney indicated that Plaintiff tolerated the procedure well, with no complications and he recommended that Plaintiff begin chemotherapy treatments.  (Tr. 159.)

On July 13, 2000, Dr. Kearney examined Plaintiff and noted that she experienced pain in the calves since beginning cycles of taxol, and that she was experiencing fatigue.  (Tr. 222.)  Dr. Kearney's disability report, dated August 16, 2000, indicated that plaintiff suffered from "serious fatigue" and mouth sores, although "her spirits appeared to be somewhat improved from the time we had seen her previously."  (Tr. 175-76.)  At that time, during chemotherapy, Dr. Kearney's impression was that plaintiff was temporarily disabled and not capable of any activity besides self-care.  (Tr. 176.)

6

### 2.  **Examinations by Dr. William Hait**

Dr. Hait's report, dated June 1, 2000, notes that Plaintiff had noticed increased fatigue accumulatively with the chemotherapy cycles, as well as right hip pain that lasted approximately two days, but had resolved.  (Tr. 241.)  Dr. Hait's remarks, following Plaintiff's chemotherapy appointment on July 27, 2000, notes that Plaintiff was experiencing a low energy level, hot flashes, night sweats, muscle aches in calves and the lower back, and numbness in the toes and fingers.  (Tr. 215.)  In his disability report of August 8, 2000, Dr. Hait reported that Plaintiff suffered from fatigue and nausea as side effects from receiving chemotherapy treatments every three weeks.  (Tr. 173-74.)  On September 14, 2000, Plaintiff again complained to Dr. Hait of fatigue and nausea, as well as numbness and tingling in her hands and feet.  (Tr. 202.)

At a follow up visit on January 18, 2001, just before Plaintiff completed her radiation treatments, Dr. Hait reported that Plaintiff stated she had been feeling well but did experience fatigue from her radiation treatments.  (Tr. 193.)  Plaintiff said that her pain had improved somewhat and denies experiencing bone pain.  (Tr. 193.)  Plaintiff's physical examination on January 18, 2001, was  normal, revealing nothing suspicious.  (Tr. 193.)

Dr. Hait's report, dated April 11, 2001, noted that Plaintiff stated she has been feeling well and denied experiencing any symptoms, including bone pain, except that "she does continue to experience fatigue although it has been improving."  (Tr. 188.)  The report also stated that Plaintiff showed no mass palpable bilaterally on her breasts and no axillary adenopathy palpable bilaterally.  (Tr. 188.)  Dr. Hait noted that Plaintiff should continue taking tamoxifen.  (Tr. 188.)

### 3.  **Examination by Dr. Eric A. Karp**

Dr. Karp said in his initial consultation report, dated October 3, 2000, that Plaintiff's

appetite was good, her weight was stable, and that Plaintiff "specifically denies any significant symptoms," other than intermittent numbness in her hands and feet and calf pain associated with her chemotherapy.  (Tr. 186.)  The report also states that Plaintiff was told of the risks of radiation therapy, including chronic fatigue and bone pain.  (Tr. 187.)

**C.  Plaintiff's Testimony at ALJ Hearing, January 31, 2002.**

At the hearing before ALJ De Steno, Plaintiff testified that she was 51 years of age, that she had graduated high school and had a year of secretarial school.  (Tr. 29.)  She is a widowed divorcee.  (Tr. 41-42.)  Her husband died on September 19, 1996.  (Tr. 42.)  Since July 1988, she worked as a in-store retail decorating consultant for various companies, which involved ordering wall coverings, decorative paint, and fabric for customers.  (Tr. 30.)  She frequently lifted 10 to 20 pounds at work.  (Tr. 30.)  Plaintiff stopped working on December 13, 1999, after a mammogram revealed a lump in her breast and a biopsy confirmed that it was cancerous.  (Tr. 31.)  Plaintiff went to Robert Wood Johnson Hospital for a lumpectomy in January, 2000, and had a re-incision surgery there in February, 2000.  (Tr. 31-32.)  In March, 2000, Plaintiff briefly returned to the hospital for treatment of an infection.  (Tr. 32.)

After waiting sufficient time to recover from the infection, Plaintiff began chemotherapy, at first going twice a week with later treatments reduced to once a week.  (Tr. 33.)  Plaintiff testified that chemotherapy was exhausting and that during that time she did not do much of anything.  (Tr. 33.)  Chemotherapy lasted until around Thanksgiving, after which she began radiation treatment daily for about six weeks. (Tr. 33.)  During the time Plaintiff was receiving Chemotherapy and radiation treatments, Plaintiff testified that she constantly felt very fatigued and had to rest and nap often.  (Tr. 34, 45.)  Plaintiff reported feeling very tired and sore from the

radiation, that it "zap[ped]" her energy, but once the treatment was completed, the fatigue

lessened somewhat. (Tr. 35.)  She experienced numbness in her hands and feet, which Dr.

Kearney told her was due to the chemotherapy.  (Tr. 36.)

       After the chemotherapy and radiation treatments ended, Plaintiff spent most of her time at

home.  (Tr. 41.)  She did not have access to a car, but sometimes her daughter or boyfriend took

her shopping.  (Tr. 41.)  The record is unclear as to whether she remained housebound for

medical reasons or because of lack of transportation.  (Tr. 41.)

       In April 2001, Plaintiff felt well enough to begin looking for work.  (Tr. 37.)  On May 7,

2001, Plaintiff testified that she started working for J.C. Penney, visiting customers' homes by

appointment to help them select decorating materials.  (Tr. 37.)  Plaintiff felt that this job was

less demanding than her previous in-store positions because she was not on her feet all day and

"had a pretty flexible schedule." (Tr. 38, 44.)  Plaintiff still found the work physically and

mentally demanding and she had to work slower than before.  (Tr. 39.)  She still had to carry

heavy sample books.  (Tr. 39.)  In this position, Plaintiff earned about $500 every two weeks,

after withholdings.  (Tr. 44.)  In mid-January 2002, she began experiencing spasms in her back.

(Tr. 44.)  She testified that she thinks the spasms are due to straining her back on the job.  (Tr.

40.)  She stopped working and her doctor planned, at the time of the hearing, to put  her into

physical therapy.[9]  (Tr. 40, 44.)

## DISCUSSION

### A.  Standard of Review

---

[9] The record contains no medical reports, documents, or records concerning Plaintiff's
complaints of back pain that resulted in her cessation of work in January, 2002.

This Court's review of the Commissioner's final decision is limited to a determination of whether ALJ De Steno applied the proper legal standards in making his findings of fact, and whether these findings are supported by substantial evidence in the record as a whole. Allen v. Bowen, 881 F.2d 37, 39 (3d Cir. 1989). If the Commissioner's decision is "supported by substantial evidence," the District Court must affirm the decision. 42 U.S.C. §§ 405(g), 1383(c)(3); Richardson v. Perales, 402 U.S. 389, 401 (1971). "Substantial evidence is such relevant evidence as a reasoning mind might accept as adequate to support a conclusion." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Substantial evidence is defined as "more than a mere scintilla" of evidence, but may be "less than a preponderance of the evidence." Ginsburg v. Richardson, 436 F.2d 1146, 1148 (3d Cir. 1971) (citation omitted).

In reviewing the totality of the evidence, this Court may not re-weigh the evidence in the record, Palmer v. Apfel, 995 F. Supp. 549, 552 (E.D. Pa. 1998), or "substitute its conclusions for those of the fact-finder." Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992) (citation omitted), cert. denied, Williams v. Shalala, 507 U.S. 924 (1993) (citation omitted). Therefore, when substantial evidence supports the ALJ's finding, the reviewing court must affirm the ALJ's holding, even if the evidence presented may also support a different conclusion. LaCorte v. Bowen, 678 F. Supp. 80, 84 (D.N.J. 1988).

**B.  Statutory Standards**

The claimant bears the initial burden of establishing his or her disability. 42 U.S.C. § 423(d)(5) (2000). To qualify for SSI benefits, a claimant must first establish that she is needy and aged, blind, or "disabled." 42 U.S.C. § 1381 (2000). A claimant is deemed "disabled" under the Act, if he or she is unable to "engage in substantial gainful activity by reason of any

10

medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); see also Kangas v. Bowen, 823 F.2d 775, 777 (3d Cir. 1987).  Disability is predicated on whether a claimant's impairment is so severe that she "is not only unable to do her previous work but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A); see also Nance v. Barnhart, 194 F. Supp. 2d 302, 316 (D.Del. 2002).  Finally, while subjective complaints of pain are considered, alone, they are not enough to establish disability.  42 U.S.C. § 423(d)(5)(A).  An impairment only qualifies as disabling if it "results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

**C.  The Five Step Evaluation Process and the Burden of Proof**

Determinations of disability are made by the Commissioner, pursuant to the five-step process outlined in 20 C.F.R. § 404.1520 (2003).  At the first step of the review, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity.[10]  20 C.F.R. § 404.1520(b).  If a claimant is found to be engaged in such activity, the claimant is not "disabled" and the disability claim will be denied.  Id.;  Bowen v. Yuckert, 482 U.S. 137, 141 (1987).

At step-two, the Commissioner must determine whether the claimant is suffering from a

---

[10] Substantial gainful activity is "work that involves doing significant and productive physical or mental duties; and is done (or intended) for pay or profit."  20 C.F.R. § 404.1510 (2003).

severe impairment.  20 C.F.R. § 404.1520(c).  An impairment is severe if it "significantly limits [a claimant's] physical or mental ability to do basic work activities."  Id.  In determining whether the claimant has a severe impairment, the age, education, and work experience of the claimant will not be considered.  Id.  If the claimant is found to have a severe impairment, the Commissioner addresses step-three of the process.

At step-three, the Commissioner compares the medical evidence of the claimant's impairment(s) with the impairments presumed severe enough to preclude any gainful work, listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (20 C.F.R. § 404.1594(f)(2)).  If the claimant's impairment(s) meets or equals one of the listed impairments he will be found disabled under the Social Security Act.  If the claimant does not suffer from a listed impairment(s) or its equivalent, the analysis proceeds to steps-four and five.

In Burnett v. Comm'r of Soc. Sec., the Third Circuit found that to deny a claim at step three, the ALJ must specify which impairments from the list apply and give reasons why those listings are not met or equaled.  220 F.3d 112, 119-20, 120 n.2 (3d Cir. 2000).  In Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004), however, the Third Circuit noted that an ALJ is not required "to use particular language or adhere to a particular format in conducting his analysis," but must merely ensure "that there be sufficient explanation to provide meaningful review of the step three determination."  An ALJ satisfies this standard by "clearly evaluating the available medical evidence in the record and then setting forth that evaluation in an opinion, even where the ALJ did not identify or analyze the most relevant Listing."  Scatorchia v. Comm'r of Soc. Sec., No. 04-3626, 2005 WL 1400363, at *2 (3d Cir. June 15, 2005).

Step-four requires the ALJ to consider whether the claimant retains the residual

12

functional capacity to perform her past relevant work.  20 C.F.R. § 404.1520(e).  If the claimant

is able to perform her past relevant work, she will be found to be not disabled under the Act.  If

the claimant is unable to resume her past work, and her condition is deemed "severe" yet not

listed, the evaluation moves to the final step.  At the fifth step, the burden of production shifts to

the Commissioner, who must demonstrate that there are other jobs existing in significant

numbers in the national economy which the claimant can perform, consistent with her medical

impairments, age, education, past work experience, and residual functional capacity.  20 C.F.R. §

404.1560(c)(1) (2003).  If the ALJ finds a significant number of jobs that claimant can perform,

claimant will be found not disabled.  Id.

**D.  Evaluation of Cessation of Benefits Cases and the Medical Improvement Standard**

In a cessation case, a plaintiff has been found, at some earlier time, to be disabled, but

subsequently findings suggest that a medical improvement in the plaintiff's condition has

rendered the plaintiff ineligible for benefits.  20 C.F.R. § 404.1594(a).  A medical improvement

is defined as "any decrease in the medical severity of your impairment(s) which was present at

the time of the most recent favorable medical decision that you were disabled or continued to be

disabled.  A determination that there has been a decrease in medical severity must be based on

changes (improvements) in the symptoms, signs and/or laboratory findings associated with your

impairment(s)."  20 C.F.R. § 404.1594(b)(1) (citation omitted).

In determining whether benefits should cease, the Commissioner must consider a number

of factors in its review.  Initially, the Commissioner must determine if Plaintiff is engaging in

substantial gainful activity.  20 C.F.R. § 404.1594(f)(1).  If the Commissioner finds that Plaintiff

is not engaged in substantial gainful activity, the Commissioner, then must determine if Plaintiff

currently has an impairment or combination of impairments which meets or equals the severity of

an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (20 C.F.R.

§ 404.1594(f)(2)).

    After determining that Plaintiff is not gainfully employed and does not have a listed

impairment, the Commissioner must decide whether Plaintiff has experienced a medical

improvement, as defined previously.  20 C.F.R. § 404.1594(f)(3).  If the Commissioner finds that

there has been a medical improvement, next he must determine if the medical improvement is

related to Plaintiff's ability to do work.  This requires a determination of whether or not there has

been an increase in the residual functional capacity based on the impairment(s) present at the

time of the most recent favorable medical determination.  20 C.F.R. § 404.1594(f)(4).  If the

Commissioner found that there has been no medical improvement or if he found that the medical

improvement is not related to Plaintiff's ability to work, the Commissioner must then consider

whether any of the exceptions to this section apply.  If none of them apply, Plaintiff's disability

will be found to continue.  20 C.F.R. § 404.1594(f)(5).[11]

    If an exception was applicable, the Commissioner will determine whether the

combination of Plaintiff's current impairments is severe.  20 C.F.R. § 404.1521.  If the residual

functional capacity assessment shows significant limitation of Plaintiff's ability to do basic work

activities, the Commissioner will move on.  20 C.F.R. § 404.1594(f)(6).  The Commissioner

must then assess Plaintiff's current ability to do substantial gainful activity in accordance with

---

    [11] There are two exceptions provided for in 20 C.F.R. § 404.1594(d) and (e).  If one of the
first group of exceptions to medical improvement is found, the Commissioner moves on to
determine whether all of Plaintiff's current impairments in combination are severe.  If an
exception from the second group of exceptions to medical improvement is found, the disability
will be found to have ended.

§ 404.1560.  20 C.F.R. § 404.1594(f)(7).  If Plaintiff is not able to do work he has done in the

past, the Commissioner will determine, given Plaintiff's residual functional capacity assessment

and considering his age, education and past work experience, whether Plaintiff could do other

work.  20 C.F.R. § 404.1594(f)(8).

## E.  **ALJ De Steno's Findings**

ALJ De Steno concluded that, under the five-step evaluation process, Plaintiff was

disabled from December 13, 1999 through January 17, 2001.  (Tr. 18.)  Neither party disputes

this decision.  (Pl.'s Br. 2; Def.'s Br. 1.)  After establishing that Plaintiff had been disabled, ALJ

De Steno reviewed Plaintiff's disability status for the period on and after January 18, 2001, under

the medical improvement standard set forth in 20 C.F.R. §§ 404.1594 and 416.994.  (Tr. 18.)

ALJ De Steno concluded that Plaintiff's disability ceased on January 18, 2001.  (Tr. 19.)

When reviewing Plaintiff's disability status, ALJ De Steno first found no indication that

Plaintiff engaged in any substantial gainful activity from December 13, 1999 through May 6,

2001.  (Tr. 16.)  ALJ De Steno found that Plaintiff returned to substantial gainful activity on May

7, 2001 until mid-January, 2002, and he denied Plaintiff's request to consider that employment as

a trial work period in light of his finding of medical improvement discussed below.  (Tr. 16.)

ALJ De Steno found that Plaintiff's impairments of breast cancer and the residual side effects of

chemotherapy and radiation treatment did not meet nor equal the criteria of any disorder listed at

20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 19.)

Although ALJ De Steno concluded that Plaintiff's impairments post-January 17, 2001,

were "severe," he concluded that the physicians' records evidenced a decrease in the medical

severity of Plaintiff's impairments.  (Tr. 19.)  ALJ De Steno also found that Plaintiff's subjective

complaints of debilitating fatigue, numbness, and back pain were not supported by the objective medical evidence in the record.[12]  (Tr. 19.)  Thus, ALJ De Steno found medical improvement in Plaintiff's impairments since Plaintiff's last, most favorable decision.  (Tr. 19.)

ALJ De Steno found that Plaintiff's residual functional capacity was limited to a compromised range of sedentary work during her period of disability.   As of January 18, 2001, the ALJ determined that Plaintiff was capable of a full range of light work, a marked  increase in functional residual activity.  (Tr. 19.)  ALJ De Steno found that with the functional capacity to perform light work, Plaintiff was capable of performing her past relevant work as in-house decorating consultant for a retail establishment. (Tr. 19.)  Plaintiff's increased residual functional capacity, together with the finding of medical improvement, meant that the improvement  was related to Plaintiff's work ability.  (Tr. 19.)  Therefore, under the standard set forth in 20 C.F.R. §§ 404.1594 and 416.994, Plaintiff's disability status ceased on January 17, 2001.  (Tr. 19.)

## F.  Analysis

Plaintiff contends that ALJ De Steno's decision terminating her disability status subsequent to January 17, 2001, is not supported by substantial evidence.  (Pl.'s Br. 2.) Specifically, Plaintiff argues that ALJ De Steno failed to present his reasoning sufficiently for determining that Plaintiff's impairments do not equal or exceed the criteria for any impairments listed at 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. § 404.1594(f)(2)), which is necessary under the standard dictated in Burnett v. Comm'r, 220 F.3d 112, 119 (3d Cir. 2000). (Pl.'s Br. 11.)  Plaintiff also argues that ALJ De Steno again did not properly outline his

_____

[12] ALJ De Sterno noted that he did consider the Plaintiff's complaints of persisting fatigue, which factored into his determination that Plaintiff's residual functional capacity was limited to light work.  (Tr. 19.)

16

reasoning for finding Plaintiff's residual functional capacity post-January 17, 2001, nor did he address the evidence contradictory to his decision, notably Plaintiff's subjective complaints of fatigue and back pain.  (Pl.'s Br. 8-10.)  Additionally, Plaintiff asserts that ALJ De Steno wrongly concluded that the period she worked, from May, 2001 to mid-January, 2002, was not a trial work period.  (Pl. Br. 10.)

This Court finds that there is substantial evidence in the record to support ALJ De Steno's conclusion that the Plaintiff's disability ceased as of January 18, 2001, due to findings of medical improvement..

### 1.  ALJ De Steno's Finding that Plaintiff's Impairment Did Not Meet or Equal a Listed Impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 is Supported By Substantial Evidence

Plaintiff does not dispute ALJ De Steno's initial finding in his evaluation of medical improvement, that she was not, at the time, performing substantial gainful activity.[13]  Plaintiff disputes ALJ De Steno's conclusion that Plaintiff's impairments did not meet nor equal any disorder listed in Appendix 1 to Subpart P of Regulation 404, by arguing that ALJ De Steno violated the standard set forth in Burnett v. Comm'r in that he did not identify the specific listing in the Appendix that came closest to matching Plaintiff's impairments.  220 F.3d 112, 119 (3d Cir. 2000).

Plaintiff's reliance on Burnett is misplaced.  In Burnett, the Third Circuit remanded an

---

[13] Plaintiff argues that ALJ De Steno erred in denying Plaintiff's Motion for a Trial Work Period, pursuant to 20 C.F.R. § 404.1592, for the period from May 7, 2000 to mid-January, 2001, when Plaintiff worked as a decorating consultant for J.C. Penney.  Entitlement to a trial work period requires that the claimant be entitled to disability benefits.  20 C.F.R. § 404.1592(d)(1). On May 7, 2000, Plaintiff was not entitled to disability benefits as per the decision of ALJ De Steno and affirmed by this Court.

ALJ decision because the ALJ did not adequately explain the reasoning behind his step three determination in the five step standard for determination of disability.  222 F.3d at 119.  The Third Circuit, however, clarified the standard set forth in Burnett in Jones v. Barnhart.  364 F.3d 501 (3d Cir. 2004).  The Third Circuit explained that the standard in Burnett is intended to ensure that the development of the record and the findings of the ALJ are sufficient to allow a "meaningful review" on appeal.  Jones, 364 F.3d at 505.   Jones does not require an ALJ to use particular language or abide by a strict format for his analysis; an ALJ can satisfy this standard by clearly analyzing all the evidence on the record and outlining his reasoning in an opinion.  Scatorchia, 2005 WL 1400363 at *2 (summarizing the Third Circuit's conclusion in Jones).   An ALJ need not identify nor analyze the most relevant listing.  Id.  In Sentyz v. Barnhart, the Third Circuit again affirmed the district court's conclusion that the ALJ's decision, which "failed to specifically identify the listings considered [by the ALJ] and to explain his conclusion that the medical evidence failed to satisfy that listing . . . 'did not warrant remand in accordance with Burnett.'" 83 F.App'x 410, 412 (3d Cir. 2003).  The Third Circuit distinguished the facts in Sentyz from Burnett in that "there was only one listing applicable to Sentyz's singular severe impairment."  Id.  Although the ALJ did not state as such in his decision, there was substantial evidence in the record to support the decision that Sentyz's impairment did not satisfy the all criteria of the obvious listing, and thus no remand was necessary.  Id. at 413.

ALJ De Steno did not identify a specific impairment from the list in the Appendix from which he compared Plaintiff's impairments, however, ALJ De Steno's evaluation is adequate. The evidence on the record and ALJ De Steno's written analysis establishes that ALJ De Steno

considered section 13.10, 20 C.R.F. Part 404, Subpart P, Appendix 1, Part A.[14]  Section 13.09 is appropriate because it alone applies to malignant neoplastic disease of the breast.  ALJ De Steno held that "[f]rom December 13, 1999 through January 17, 2001, the claimant had 'severe' impairments consisting of breast cancer and the side effects of chemotherapy and radiation treatments."  (Tr. 20.)  No other disorder on the list is more similar.  Since January 18, 2001, her 'severe' impairments are status post right breast carcinoma and the residual effects of chemotherapy and radiation treatments."  (Tr. 20.)  The record is silent as to any impairments Plaintiff had that did not concern breast cancer.

The substantial evidence standard, as used here to review the findings of ALJ De Steno, is deferential, which "includes deference to inferences drawn from the facts if they, in turn are supported by substantial evidence."  Schaudeck v. Comm'r, 181 F.3d 429, 431 (3d Cir. 1999).  The medical evidence on record provides substantial evidence that ALJ De Steno's finding that the criteria for any impairment, specifically the criteria for section 13.09, on the list was not met.  Since the record showed no evidence of inflammatory carcinoma and no signs of recurrence or metastases of the tumor, ALJ De Steno concluded that Plaintiff's impairments did not satisfy the requirements of sections 13.08B, 13.09C, 13.09D, and 13.09E of this listing.  (Tr. 17, 175, 191.)  The record provides substantial evidence to supports ALJ De Steno's conclusion that Plaintiff's impairments do not meet the criteria of any disorder on the listing of impairments.

_____

[14] Section 13.00 is titled "Maligent Neoplastic Diseases," all malignant neoplasms except certain neoplasms associated with human immunodeficiency virus (HIV) infection.  Sub-section 13.10 pertains to "Breast (except sarcoma)."  20 C.F.R. Pt. 404, Subpt. P, App. 1

**2.  ALJ De Steno Property Evaluated the Medical Evidence and Plaintiff's Subjective Complaints of Pain and Fatigue**

Plaintiff also argues that ALJ De Steno's finding of medical improvement related to work activity is not supported by substantial evidence in the record nor adequately addressed in his decision.  This Court finds ample evidence in Plaintiff's physician records and testimony to support a finding of medical improvement.

Plaintiff relies on Cotter v. Harris, 642 F.2d 700 (3d Cir. 1981), in asserting that ALJ De Steno did not adequately explain his determination that the Plaintiff's medical improvement was sufficiently related to her work activity, deeming Plaintiff no longer disabled.  (Pl.'s Br. 9.)  The ALJ's analysis is, however, sufficient to satisfy Cotter.  In Cotter, the court found that the ALJ (1) wrongly gave great weight to a physician's medical report, which lacked any clinical reports or observations and (2) failed to explain his rejection of other contradicting expert medical testimony or even acknowledge its existence.  642 F.2d at 707.  See also Bush v. Barnhart, 97 F.App'x 393, 395 -396 (3d Cir. 2004) (concluding that claimant's use of Cotter is misplaced under similar facts).  That is not the situation here.  ALJ De Steno considered and acknowledged each of the physicians' reports submitted on or about and subsequent to January 17, 2001.  (Tr. 17.)  Consequently, these reports note improvements in Plaintiff's medical condition and support the ALJ's conclusion.  (Tr. 17-18.)  Any evidence contradictory to ALJ De Steno's decision, although considered and weighed against the other evidence, is not sufficient to reach a contrary conclusion.  Substantial evidence, taken from the record as a whole, supports a balancing of the evidence in support of ALJ De Steno's finding.

The Third Circuit instructed that "treating physicians' reports should be accorded great

20

weight especially 'when their opinions reflect expert judgment based on continuing observation of the patient's condition over a prolonged period of time.'"  Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) (citing Rocco v. Heckler, 826 F.2d 1348, 1350 (3d Cir. 1987); 20 C.F.R. § 404.1527(d)(2) (providing for controlling weight where treating physician's opinion is well-supported by medical evidence and not inconsistent with other substantial evidence in the record).  The multiple reports of Dr. Kearney and Dr. Hait, spanning Plaintiff's cancer treatment, are consistent with ALJ De Steno's findings of medical improvement.  Dr. Kearney's records state the undisputed fact that Plaintiff was diagnosed with breast cancer in December, 1999, and underwent a surgical lumpectomy to attack the cancer in January, 2000.  (Tr. 161-64.)  After some delay due to an infection in the axillary region, Plaintiff began chemotherapy cycles in March 2000, under the supervision of Dr. Hait.  (Tr. 173.)  Plaintiff's physician records from March through mid-December, 2000, evidenced that Plaintiff suffered from fatigue, right hip pain, hot flashes, night sweats, nausea muscle aches in her calves and the lower back, and numbness in the toes and fingers, as side effects from the chemotherapy and radiation treatments. (Tr. 215, 222, 241, 173-74.)

By January 18, 2001, Plaintiff's physicians reported that her medical conditions had improved.  Dr. Hait reported that Plaintiff's physical examination on January 18, 2001 was normal, other than some radiation discoloration of the right breast.  (Tr. 193.)   Plaintiff was no longer receiving chemotherapy treatments or radiation treatments, although she continued to take tamoxifen.  (Tr. 188.)  Dr. Kearney recorded on January 19, 2001, that Plaintiff "appears quite healthy" with "no sign of recurrence."  (Tr. 191.)  On April 19, 2001, the final report in the record, Plaintiff showed no mass palpable bilaterally on her breasts and no axillary adenopathy

palpable bilateral.  (Tr. 188.)  This evidence is consistent with Plaintiff's ability to return to work in May 2001.

Plaintiff argues that ALJ De Steno erred in evaluating Plaintiff's medical improvement by failing to address her subjective complaints of fatigue, numbness, and pain, which Plaintiff attests remained sufficiently debilitating after January 17, 2001, to justify her need to avoid all significant work activity.  This Court, however, finds that there is substantial evidence to support ALJ De Steno's conclusion that such subjective complaints after January 17, 2001 are only debilitating to the extent that they limited Plaintiff's residual functional capacity was to the light work range.  (Tr. 17.)

While an ALJ must consider a claimant's subjective complaints of pain when evaluating disability benefits, Dorf v. Brown, 794 F.2d 896 (3d Cir. 1986), there must be objective medical evidence of an impairment that could cause the pain in the record.  Green v. Schweiker, 749 F.2d 1066, 1071 (3d Cir. 1984).  The Third Circuit has held that even when the medical evidence does not fully confirm complaints of pain, the subjective complaints must be seriously considered by the ALJ, and if a claimant's testimony regarding pain is reasonably supported by medical evidence, medical evidence to the contrary is required for an ALJ to discount the claimant's pain.  Ferguson v. Schweiker, 765 F.2d 31, 37 (3d Cir. 1985).

To evaluate Plaintiff's subjective complaints, ALJ De Steno reviewed the objective medical and non-medical evidence and considered six factors regarding the nature of the pain, Plaintiff's attempts to treat the pain, and how the pain affects Plaintiff.  (Tr. 17.)

Dr. Kearney and Dr. Hait each reported throughout Plaintiff's treatments that she suffered from significant fatigue, as well as pain and numbness, as a result of her chemotherapy and

22

radiation treatments.[15]  (Tr. 173-76, 215, 241.)  On August 16, 2000, Dr. Kearney believed that

Plaintiff suffered from "serious fatigue" to the extent that Plaintiff was temporarily disabled and

not capable of any activity except for self-care.  (Tr. 176.)  Plaintiff testified that she constantly

felt fatigued during chemotherapy and had to nap frequently.  (Tr. 35.)  Radiation "zapped" her

energy, but once the radiation had completed, she testified that the fatigue lessened.  (Tr. 35.)

     In April, 2001, Plaintiff stated she had been feeling well and told Dr. Hait that she was

not experiencing any symptoms, including bone pain, and although she was fatigued, it was

"improving."  (Tr. 188.)  That same month, Plaintiff began looking for employment and inquired

about openings with her last employer.  (Tr. 28.)  By May 7, 2001, Plaintiff felt well enough to

work regularly for J.C. Penney, where she had to lift heavy decorating books.  (Tr. 28.)  Although

Plaintiff testified that she was forced to leave this position in January, 2001, because of back pain

and back spasms, Plaintiff also testified that the pain was related to lifting heavy objects rather

than the effects of her cancer treatments.  (Tr. 40.)

     Plaintiff asserts that ALJ De Steno's finding, that medical improvement is related to

Plaintiff's ability to do work, is not supported by substantial evidence.  Specifically, Plaintiff

argues that when evaluating Plaintiff's latest residual functional capacity, ALJ De Steno did not

sufficiently consider Plaintiff's subjective complaints of fatigue and pain.  (Pl.'s Br. 15, 17.)

When assessing whether Plaintiff's medical improvement is relevant to the Plaintiff's working

---

[15] As of April 19, 2001, Plaintiff's medical records show that she was still taking
tamoxifen. (Tr. 188.)  Plaintiff testified on January 31, 2002 that she still took tamoxifen.  (Tr.
40.)  There is no evidence on the record showing or inferring that Plaintiff suffered any negative
side-effects, pain or fatigue from tamoxifen.  The fact that Plaintiff was taking tamoxifen does
not sufficiently contradict the evidence on the record taken as a whole, which supports ALJ De
Steno's decision.

ability, ALJ De Steno reevaluated Plaintiff's residual functional capacity to do work based on the
impairments present at the time of the most recent favorable medical determination, pursuant to
20 C.F.R § 404.1594(f)(4).  ALJ De Steno concluded that Plaintiff's functional capacity to do
work increased to a full range of light work as of January 18, 2001, a marked increase from when
Plaintiff lacked the capacity to perform a full, wide, or significant range of even sedentary work.
(Tr. 20.)

This Court finds, despite Plaintiff's subjective complaints of back pain and fatigue, that
the evidence supports ALJ De Steno's conclusion that Plaintiff has the residual functional
capacity to perform a full range of light work.[16]  (Tr. 18, 20.)  An ALJ must "give weight to a
claimant's subjective testimony of the inability to perform even light or sedentary work when this
testimony is supported by competent medical evidence."  Schaudeck 181 F.3d at 433.  As
discussed above, the medical evidence supports a significant improvement in the Plaintiff's
fatigue since her chemotherapy and radiation therapy ended.  Plaintiff did not testify that fatigue
affected her ability to work from May 2000 to January, 2001, but rather back pain caused her to
leave that employment and that she thought she might return soon.  (Tr. 28, 40.)  The back pain,
as Plaintiff testified at her hearing, resulted from lifting heavy objects and was not the result of
her severe impairments associated with breast cancer.  (Tr. 40. )  Because there is no objective
medical evidence to support a severe medical condition that would result in the Plaintiff's back
pain, ALJ De Steno's conclusion that Plaintiff is capable of past relevant work, consistent with a

---

[16] Under 20 C.F.R. §§ 404.1567(b) and 416.967(b), a determination of a claimant's
residual functional capacity to perform a full range of light work includes: the capacity of lifting
and carrying objects weighing up to 20 pounds; frequently lifting and carrying objects weighing
up to 10 pounds; standing, walking, and sitting up to six hours in an eight-hour day; and pushing
and pulling arm and leg controls.  20 C.F.R. §§ 404.1567(b) and 416.967(b).

24

residual functional capacity of a range of light work, is supported by substantial evidence.

In addition, Plaintiff asserts that ALJ De Steno provided no reasoning for his determination that Plaintiff's past relevant work required the functional capacity to do light work. (Pl.'s Br. 26.)  ALJ De Steno concluded that the light work capacity would meet the requirements of Plaintiff's previous work as an in-store decorating consultant based on Plaintiff's own description of the job's requirements.  (Tr. 18, 20.)  ALJ De Steno does not compare Plaintiff's residual functional capacity to Plaintiff's job with J.C. Penney from May 2000 through January 2001, since the ALJ finds Plaintiff to be capable of her more demanding, earlier employment. (Tr. 19.)  Yet, ALJ De Steno considered Plaintiff's testimony of her ability to perform the requirements of her J.C. Penney job, which are similar to the requirements of her former in-store job as well as the requirements associated with "light work" under the Act.  (Tr. 19.)

## CONCLUSION

For the reasons stated above, this Court finds that substantial evidence exists to support the Commissioner's decision to terminate Plaintiff's period of disability as of January 18, 2001, and denying her applications for Disability Insurance Benefits, Supplemental Security Income Benefits, and Disabled Widow's Insurance Benefits.  Thus, the Commissioner's decision is AFFIRMED.


 S/Joseph A. Greenaway, Jr.
JOSEPH A. GREENAWAY, JR., U.S.D.J.


Dated: September 30, 2005